1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11   ANDREA BOARMAN,                        No. 2:11-cv-02825 KJM KLN

12              Plaintiff,

13        v.                                ORDER

14   COUNTY OF SACRAMENTO, et al.,

15              Defendant.

16

17              On August 22, 2014, the court heard argument on the motion for summary

18   judgment filed by defendants County of Sacramento, City of Rancho Cordova, Officer Sean

19   Barry, and Officer Manuel Konstantinidis (collectively defendants), as well as plaintiff's motion

20   to modify the scheduling order.  Robert Chalfant appeared for defendants; Manolo Olaso

21   appeared for plaintiff Andrea Boarman.  After considering the parties' arguments, the court

22   DENIES the motion to modify the scheduling order and GRANTS IN PART and DENIES IN

23   PART the motion for summary judgment.

24   I.  BACKGROUND

25              On October 26, 2011, plaintiff filed a complaint alleging generally that defendants

26   had violated her state and federal rights in connection with an encounter at a CVS Store in

27   Rancho Cordova on January 16, 2011.  ECF No. 1.  Defendants filed a motion to dismiss, which

28   the court granted on September 27, 2012.  ECF Nos. 6, 14.

                                           1

1    Plaintiff filed her First Amended Complaint on October 26, 2012.  ECF No. 15.

2    Defendants again moved to dismiss, ECF No. 16, and on March 29, 2013, the court granted the

3    motion in part and denied it in part.  ECF No. 22.

4    On April 18, 2013, plaintiff filed a Second Amended Complaint.  ECF No. 24.

5    Defendants moved to dismiss plaintiff's claim of a violation of California Civil Code § 51.7.

6    ECF No. 25.  The court granted the motion on July 26, 2013.  ECF No. 31.

7    Defendants answered on August 9, 2013.  ECF No. 32.

8    The court held a pretrial scheduling conference on October 17, 2013, and on

9    October 31, 2013, issued a pretrial scheduling order.  ECF Nos. 34, 35.  That order set March 24,

10   2014 as the discovery cut-off date, October 30, 2014 as the final pretrial conference date, and

11   January 5, 2015 as the trial date.   ECF No. 35 ¶¶ IV, VII, IX.  The order memorialized the

12   parties' waiver of conflict and agreement to the assigned magistrate judge as the settlement judge

13   for a settlement conference in December 2014.  *Id.* ¶ X.

14   On February 20, 2014, the court approved the parties' stipulation to extend the

15   discovery cut-off date to July 4, 2014.  ECF No. 38.

16   On June 5, 2014, the court approved the parties' stipulation to substitute Manuel

17   Konstantinidis for Doe defendant 1 in the Second Amended Complaint.  ECF No. 43.

18   On June 9, 2014, plaintiff filed the Third Amended Complaint (TAC), the

19   operative complaint, which raises three civil rights claims and two state law claims:  (1) excessive

20   force; (2) false arrest; (3) municipal liability; (4) common law battery; and (5) interference with

21   civil rights, Cal. Civ. Code § 52.1.  ECF No. 47.  Defendants answered the complaint on June 19,

22   2014.  ECF No. 49.

23   Plaintiff filed the motion to modify the scheduling order on July 21, 2014.  ECF

24   No. 52.  Defendants have opposed the motion and plaintiffs have filed a reply.  ECF Nos. 58, 60.

25   Defendants filed a motion for summary judgment on July 25, 2014.  Plaintiff has

26   opposed the motion and defendants have filed a reply.

27   On July 25, 2014, the court approved the parties' stipulation to allow plaintiff to

28   depose the defense expert after the expert discovery cut-off date.  ECF No. 56.

1    II. MOTION TO MODIFY THE SCHEDULING ORDER

2        A.  Background

3            Plaintiff seeks to extend the dates for discovery cut-off, final pretrial conference,

4    and trial.  She supports the request with the declaration of counsel Manolo Olaso,[1] who avers that

5    after the settlement conference on June 14, 2014, defendants unilaterally scheduled plaintiff's

6    deposition for June 17.  Decl. of Manolo Olaso, ECF No. 52-2 ¶ 7.  Olaso told defense counsel

7    Robert Chalfant that plaintiff was not available on that date and agreed to reschedule the

8    deposition for after the discovery cut-off.  Olaso asked Chalfant for dates to depose the two

9    individual officer defendants, but Chalfant said the discovery cut-off prevented these depositions.

10   *Id*. ¶ 9.  Olaso avers plaintiff postponed discovery "to devote resources to position the case for

11   early resolution," believing the case would proceed to early settlement.  *Id*. ¶ 11.  Neither party

12   had taken any depositions before the settlement conference on June 14.  *Id.* ¶ 12.  Olaso says he

13   wants additional time to depose the individual officers and to complete discovery with respect to

14   the training and supervision regarding Taser use.  *Id*. ¶ 14.  He also points out that Konstantinidis

15   was not named until the Third Amended Complaint was filed on June 9, 2014.  *Id*. ¶ 13.

16           Defendants have opposed and provided the declaration of defense counsel

17   Chalfant.  Chalfant avers that as part of his initial disclosures made on November 18, 2013, he

18   identified Officers Barry and Konstantinidis as having discoverable information and provided

19   reports written by both officers, including information about Konstantinidis's use of a taser.

20   Decl. of Robert Chalfant, ECF No. 58-1 ¶ 12 & Ex. D, ECF No. 58-1 at 26-28.  However, since

21   filing this action, plaintiff has served no written discovery nor taken any depositions.  *Id*. ¶ 18.

22           In February 2014, Olaso made a settlement demand; in March, Chalfant rejected it,

23   but made a counter-offer.  *Id*. ¶¶ 13-14.  The parties decided to seek a settlement conference,

24   which was eventually set for June 13, 2014.  Plaintiff's initial demand at the conference was over

25   four times higher than the previous demand.  *Id*.

26   /////

27   _____

28       [1] Olaso claimed he provided redacted copies of his email exchanges with counsel, but
these were not supplied until the reply.  ECF No. 52-2 ¶ 5; ECF No. 60-1 at 4-11.

B.  Analysis

Federal Rule of Civil Procedure 16(b)(4) states that "[a] schedule may be modified only for good cause and with the judge's consent."  "Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking the amendment. The district court may modify the pretrial schedule 'if it cannot reasonably be met despite the diligence of the party seeking the extension.'"  *Johnson v. Mammoth Recreations*, 975 F.2d 604, 609 (9th Cir. 1992) (quoting FED. R. CIV. P. 16 advisory committee's notes (1983 amendment)).  "Although the existence or degree of prejudice to the party opposing the modification might supply additional reasons to deny a motion, the focus of the inquiry is upon the moving party's reasons for seeking modification. [citation omitted] If the party was not diligent, the inquiry should end."  *Id.*  Moreover, "'[a] party who fails to pursue discovery in the face of a court ordered cut-off cannot plead prejudice from his own inaction.'"  *Dunfee v. Truman Capital Advisors, LP*, Civil No. 12–cv–1925–BEN (DHB), 2013 WL 5603258, at *4 (S.D. Cal. Oct. 11, 2013) (quoting *Rosario v. Livaditis*, 963 F.2d 1013, 1019 (7th Cir. 1992).

It is true that plaintiff did not seek to bring Konstantinidis into the action until June of this year, but defendants had disclosed Konstantinidis's name and provided his report with their initial disclosures on November 8, 2013.  In reply, plaintiff concedes she became aware of his identity when she received the initial disclosures.  ECF No. 58-1 at 26-27; Reply, ECF No. 60 at 2.  Plaintiff could have discovered his connection to the incident and scheduled his deposition earlier.

Plaintiff says she was postponing discovery in hopes of an early settlement, but the pretrial scheduling order suggests the parties had not contemplated a settlement conference until shortly before trial.  ECF No. 35 ¶ X.  Even assuming plaintiff was delaying discovery until settlement overtures had been exhausted, she does not explain why she undertook no discovery after defendants rejected her offer in March 2014.  Moreover, not only did plaintiff fail to pursue discovery until June, shortly before the extended cut-off date, she did not seek relief from the cut-off before it expired.  *See Cornelius v. Deluca*, No. 1:10-CV-027 BLW, 2011 WL 1114315, at *3 (D. Idaho Mar. 25, 2011) ("At the very least, Plaintiffs could have asked the Court to extend the

1  discovery deadline *before* it expired.  Instead, Plaintiffs did nothing.").  She has not been diligent.

2  Her request is denied.

3  III.  MOTION FOR SUMMARY JUDGMENT

4          Plaintiff raises claims for false arrest, common law battery, interference with civil

5  rights, and excessive force in the Third Amended Complaint.  The excessive force claim raises

6  both the officers' use of handcuffs and of a taser during the course of the encounter.  In this

7  motion, defendants do not seek summary judgment on that portion of the excessive force claim

8  stemming from the taser use nor the common law battery claim.  Accordingly, the court addresses

9  only the challenges to the false arrest, interference with civil rights, and use of handcuffs.

10         A.  Standard

11         A court will grant summary judgment "if . . . there is no genuine dispute as to any

12  material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).

13  The "threshold inquiry" is whether "there are any genuine factual issues that properly can be

14  resolved only by a finder of fact because they may reasonably be resolved in favor of either

15  party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).[2]

16         The moving party bears the initial burden of showing the district court "that there

17  is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*,

18  477 U.S. 317, 325 (1986).  The burden then shifts to the nonmoving party, which "must establish

19  that there is a genuine issue of material fact . . . ." *Matsushita Elec. Indus. Co. v. Zenith Radio

20  Corp.*, 475 U.S. 574, 585 (1986).  In carrying their burdens, both parties must "cit[e] to particular

21  parts of materials in the record . . .; or show [] that the materials cited do not establish the absence

22  or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to

23  support the fact."  Fed. R. Civ. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[the

24  nonmoving party] must do more than simply show that there is some metaphysical doubt as to the

25  material facts").  Moreover, "the requirement is that there be no genuine issue of material fact

26

27         [2] Rule 56 was amended, effective December 1, 2010.  However, it is appropriate to rely on cases decided before the amendment took effect, as "[t]he standard for granting summary judgment remains unchanged."  Fed. R. Civ. P. 56, Notes of Advisory Comm. on 2010 amendments.

28

. . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247-48 (emphasis in original).

In deciding a motion for summary judgment, the court draws all inferences and views all evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

A court may consider evidence as long as it is "admissible at trial." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). "Admissibility at trial" depends not on the evidence's form, but on its content. *Block v. City of L.A.*, 253 F.3d 410, 418-19 (9th Cir. 2001) (citing *Celotex Corp.*, 477 U.S. at 324). The party seeking admission of evidence "bears the burden of proof of admissibility." *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1004 (9th Cir. 2002). If the opposing party objects to the proposed evidence, the party seeking admission must direct the district court to "authenticating documents, deposition testimony bearing on attribution, hearsay exceptions and exemptions, or other evidentiary principles under which the evidence in question could be deemed admissible . . . ." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 385-86 (9th Cir. 2010).

B. Facts

When the parties agree a fact is undisputed, the court cites to plaintiff's response to defendants' statement of undisputed facts. Disputed facts are discussed with the evidentiary support for the parties' competing positions. The court will not cite any facts unless they are relevant to the issues presented by this motion. For example, in her Memorandum of Points and Authorities, plaintiff "agrees that a detention could take place" but challenges "how the detention was carried out." Mem. P. & A., ECF No. 57 at 7. In light of this concession, the court does not address the disputed facts relevant only to the officers' reasonable suspicion for the detention. In

/////

1    addition, at hearing defendants said they were not seeking summary judgment on the taser use,

2    but only on the officers' use of handcuffs, and so the court narrows its focus accordingly.

3            Defendants have provided copies of in-car videos made by defendants Barry and

4    Konstantinidis; plaintiff has not contested their accuracy.  Some of the events of January 16, 2011

5    occur at the edge of the video, but are audible.

6            The existence of the videos does not change the usual rules of summary judgment:

7    in general, the court will draw all reasonable inferences from the video in plaintiff's favor.

8    *Blankenhorn v. City of Orange*, 485 F.3d 463, 468 n.1 (9th Cir. 2007); *Ratcliff v. City of Red*

9    *Lodge*, No. CV 12-79-BLG-DWM-JCL, 2014 WL 526709, at *3 n.2 (D. Mont. Jan. 10, 2014),

10   *recommendation adopted as modified by* 2014 WL 526695, at *5 (D. Mont. Feb. 7, 2014).

11   However, if the videos "blatantly contradict" a party's account, "so that no reasonable jury could

12   believe it," the court need not credit it on summary judgment.  *Scott v. Harris*, 550 U.S. 372, 380

13   (2007); *see also Witt v. W. Va. State Police Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) ("*Scott*

14   does not hold that courts should reject a plaintiff's account whenever documentary evidence, such

15   as a video, offers *some* support for a governmental officer's version of the events . . . .  *Scott*

16   simply reinforces the unremarkable principle that '[a]t the summary judgment stage, facts must be

17   viewed in the light most favorable to the nonmoving party' when there is a *genuine* dispute as to

18   those facts.') (emphases in original) (citation omitted); *Coble v. City of White House, Tennessee*,

19   634 F.3d 865, 869 (6th Cir. 2011) (refusing to find plaintiff's version blatantly contradicted by an

20   audio recording because "[m]any factors could affect what sounds are recorded, including the

21   volume of the sound, the nature of the activity at issue, the location of the microphone, whether

22   the microphone was on or off, and whether the microphone was covered").

23           The events giving rise to this action occurred in the City of Rancho Cordova (City)

24   on January 16, 2011.  The City contracts with the County of Sacramento (County) for law

25   enforcement services.  Pl.'s Resp. to Defs.' Statement of Undisputed Facts, ECF No. 57-1 ¶ 27.

26   "The contract requires all Sheriff's personnel assigned to the City to comply exclusively with

27   Sheriff's Department Policies and Procedures and to remain under the exclusive control and

28   direction of the Sheriff's Department."  *Id*. ¶¶ 28, 37-38.  County policy requires that all arrests

1  be based on probable cause and that "officers shall use only that force which is reasonable, given

2  the facts and circumstances perceived by the officer at the time of the event, to effectively bring

3  an incident under control."  Decl. of Sean Barry, ECF No. 54-3 ¶ 16 & Ex A, ECF No. 54-3 at 10;

4  Decl. of Glen Barawed, ECF No. 54-5 ¶ 5.

5          Sean Barry, Manuel Konstantinidis, and Glen Barawed were employed by the

6  Sacramento County Sheriff's Department on January 16, 2011.  ECF No. 57-1 ¶ 36; Decl. of Glen

7  Barawed, ECF No. 54-5 ¶ 6.  Neither Barry nor Konstantinidis had been told by anyone in the

8  Sheriff's Department that deputies should arrest or use force on people who express anger,

9  annoyance or contempt toward a peace officer.  ECF No. 54-3 ¶¶ 15, 17.[3]  Decl. of Manuel

10 Konstantinidis, ECF No. 54-4 ¶¶ 9-10; ECF No. 54-3 ¶ 15.  Barry and Konstantinidis have

11 received training from the Sheriff's Department on use of force, arrest and control techniques,

12 and the law of arrest.  ECF Nos. 54-3 ¶ 4 & 54-4 ¶ 4.

13         On the evening of January 16, 2011, Andrea Boarman was at the CVS Pharmacy

14 on Zinfandel Drive in Rancho Cordova and learned there had been a shoplifting incident.  Decl.

15 of Andrea Boarman, ECF No. 57-2 ¶¶ 4-5.  Boarman left the store with her purchases and the

16 receipt.  *Id.* ¶ 6.

17         Around 8:30 on the evening of January 16, 2011, the Sacramento County Sheriff's

18 Department dispatched Barry and Barawed to a CVS Pharmacy on Zinfandel Drive in Rancho

19 Cordova to respond to a call about a fight between the store manager and a black female,

20 approximately twenty years old, wearing a black jacket and dark pants.  ECF No. 57-1 ¶¶ 1-3, 17.

21         As Boarman walked across the parking lot, she could see police cars approaching.

22 ECF No. 57-2 ¶ 7.  Barry and Barawed, arriving two minutes after the call from dispatch, saw

23 Boarman walking away from the store; Boarman is an African-American female in her twenties

24 and was wearing a dark jacket and pants.  ECF No. 57-1 ¶¶ 4-5, 12, 17.  Barry decided to detain

25 /////

26

27         [3] In their Statement of Undisputed Facts, defendants cite to portions of Konstantinidis's
   declaration, purporting to establish the same proposition.  Defendants have omitted a page of the
28 declaration in their filing.  *See* ECF No. 54-4.

1    Boarman because she met the description of the person in the call and was leaving the area within

2    minutes of the call and so he instructed her to stop.  ECF No. 57-1 ¶¶ 8, 13.

3             Neither party recounts what Barry initially said to Boarman, but Boarman says she

4    told Barry she had been in the store when an employee called the police and that she was not

5    involved in the shoplifting incident.  ECF No. 57-2 ¶ 9.  She offered Barry her receipt to show she

6    had paid for the items in the bag.  ECF No. 57-1 ¶ 14; ECF No. 57-2 ¶ 9.  Boarman says Barry

7    refused to look at the receipt.  ECF No. 57-1 ¶ 9.  Barry says the receipt showed Boarman had

8    been in CVS, but did not eliminate her as a suspect in the fight with the manager or as an

9    accomplice to the shoplifters.  ECF No. 54-3 ¶ 34.  Barry told Boarman he was detaining her

10   temporarily; Boarman asked him to contact other deputies to ascertain what had occurred.  ECF

11   No. 54-3 ¶ 36.  Barry says Boarman did not listen as he attempted to explain that was precisely

12   what he was doing.  ECF No. 54-3 ¶ 36.  It is not clear whether this portion of the exchange is

13   reflected on the videos, but what is captured on the videos does not show Boarman's refusal to

14   listen; rather, the video shows her insistence on her innocence in response to what the police were

15   telling her.

16           Because Barry was increasingly rude to her, Boarman became upset.  ECF

17   No. 57-2 ¶ 10.

18           At about this time, Konstantinidis arrived, with his camera activated; Barry

19   activated his camera as well.  ECF Nos. 54-4 ¶ 19 & 54-3 ¶ 38.  The videos, Exhibits C and G,

20   show an agitated Boarman, asking the deputies to look at her receipt and moving around.  Barry

21   claims he feared for his safety because Boarman continued to step toward him, causing him to

22   back up until he was at the edge of the street.  ECF No. 54-3 ¶ 37.  Konstantinidis describes

23   Boarman as agitated, waving her hands in the air, insisting she had paid for the items in her bag.

24   ECF No. 54-4 ¶ 21.  Boarman denies making any aggressive advances toward Barry and says she

25   was not attempting to flee.  ECF No. 57-2 ¶¶ 13-14.

26           The videos do show an upset Boarman, vociferous in her assertion that she had

27   paid for her merchandise, in her denial of any involvement in the shoplifting incident, and in her

28   demand that the officers ask the manager to confirm she had not been involved.  She is moving

9

1   about, but her gestures are not threatening.  Both officers, each bigger than Boarman, are

2   speaking forcefully.

3          About the same time Barry initially contacted Boarman, Barawed talked to the

4   manager of the CVS, who said two suspects had fled in a car but that the third, a woman in her

5   twenties wearing a dark jacket and pants, had not.  ECF No. 57-1 ¶¶ 18-19.  Barawed could see

6   Barry and Boarman about 200 feet away and told Barry via radio to detain Boarman because she

7   matched the manager's description.  ECF No. 57-1 ¶¶ 20-21.  Barawed says he determined the

8   crime had been a robbery, but does not say whether he conveyed this information to Barry.  ECF

9   No. 54-5 ¶ 15.

10          Konstantinidis, standing behind Boarman, decided to handcuff her and told her to

11   put her hands behind her back.  ECF No. 54-4 ¶¶ 25-26.  As he took control of Boarman's left

12   wrist, Boarman spun away from Konstantinidis, jerked her hands up, and said, "Uh, uh, no, uh,

13   uh." ECF No. 57-1 ¶ 23.  Konstantinidis yelled at Boarman to put her hands behind her back and

14   Barry attempted to grab her right wrist.  ECF No. 54-3 ¶¶ 46-47; ECF No. 54-4 ¶ 28.  Boarman

15   pulled her arm away, pushing her body into Barry's.  ECF No. 54-3 ¶ 47.  Barry says Boarman's

16   right hand was in a fist; Boarman says she kept the receipt in her right hand.  *Compare* ECF

17   No. 54-3 ¶ 47 *with* ECF No. 57-2.  The videos show Boarman clutching the receipt in her right

18   hand and then attempting to jerk her hand away as Barry grabs for it.

19          Konstantinidis attempted to get his arm around Boarman's neck from behind.

20   ECF No. 54-4 ¶¶ 29-30.  Barry claims he pushed on Boarman's upper body while stabilizing her

21   lower body with his leg as he pushed her onto the street.  No. 54-3 ¶ 50.  The videos show Barry

22   throwing Boarman forcefully to the ground and she describes landing hard.  ECF No. 57-2 ¶ 16.

23          The videos do not provide a very clear view of what occurred when Boarman was

24   on the ground.  They do show Barawed and another officer running to join the officers with

25   Boarman as Barry threw Boarman down.  ECF No. 54-5 ¶ 19.  The officers describe Boarman's

26   continued resistance to being handcuffed, with Barry describing her hands as balled into fists and

27   her continued resistance by rolling around on the ground.  ECF No. 54-3 ¶ 52; ECF No. 54-4

28   /////

1   ¶ 31.  Boarman denies clenching her fists or pulling her hands away from Barry or rolling around

2   on the ground.  ECF No. 57-2 ¶ 17.

3           After Boarman was on the ground, Konstantinidis decided to use his taser based on

4   Boarman's resistance and the violent nature of the reported crime.  ECF No. 54-4 ¶ 32.  As

5   Konstantinidis yelled, "taser, taser, taser," Barry backed away from Boarman and Konstantinidis

6   activated the taser.  ECF No. 54-4 ¶ 36.  The videos reflect Konstantinidis yelling and Barry

7   springing back.   Konstantinidis did not warn Boarman he intended to use the taser apart from his

8   more general warning.  Boarman says she did not hear anyone say "taser" and would not have

9   known what to do even if she had.  ECF No. 57-2 ¶ 19.

10          Konstantinidis says the taser did not immobilize Boarman, who continued to resist

11  Barry's attempts to handcuff her.  ECF No. 54-4 ¶¶ 36-37.  Boarman says she felt extreme pain

12  and was unable to move.  ECF No. 57-2 ¶ 18.  The officers yelled at her several times to put her

13  arms out to the side; Boarman yelled "it wasn't me."  ECF Nos. 54-4 ¶ 37, 54-3 ¶ 54 & 57-2 ¶ 18.

14  Boarman did not think she could move her arms, but eventually did so and was handcuffed.  ECF

15  No. 57-2 ¶ 18; ECF No. 54-4 ¶ 37; ECF No. 54-3 ¶ 54.  Barry "concluded that Boarman's

16  conduct provided cause to arrest her for resisting, obstructing, or delaying a peace officer."  ECF

17  No. 54-3 ¶ 54.  Barry helped Boarman to her feet and took her to the patrol car.  ECF No. 54-3

18  ¶ 56.

19          Konstantinidis then watched the store surveillance video and determined Boarman

20  had not been involved in the shoplifting incident.  ECF No. 54-3 ¶ 58.  Barry cited her for a

21  violation of California Penal Code §148(a)(1).  ECF No. 54-3 ¶ 59 & Ex. H.  At the hearing on

22  the motion, defendants said the charge had been dropped.

23      C.  Excessive Force

24          In their motion for summary judgment on this claim, defendants argue the

25  detention was proper as a matter of law and that Konstantinidis is not liable for an unlawful

26  detention because Barry had detained Boarman before Konstantinidis had arrived.  Defs.' Mot.

27  for Summ. J., ECF No. 54-1.  They do not specifically address plaintiff's claim in the Third

28  /////

1    Amended Complaint that the detention was unlawful because of the force involved.  *See* ECF

2    No. 47 ¶¶ 35-38.

3            In opposition, plaintiff concedes "that a detention could take place," but says no

4    circumstances justified the officers' decision to handcuff her, which made the detention

5    unreasonable.  Pl.'s Opp'n, ECF No. 57 at 8.

6            In reply defendants argue the handcuffing was proper given plaintiff's

7    uncooperative behavior and the violent crime they were investigating.

8            Both defendants' attack on the detention and plaintiff's response to it are puzzling.

9    Plaintiff alleged that the officers did not have reasonable suspicion to detain her, ECF No. 47

10   ¶ 22, but did not include a separate claim on that ground.  *Id*. ¶¶ 35-53.   Defendants nevertheless

11   justify the detention in their moving papers and plaintiff responds to the justification by arguing

12   that the handcuffing rendered the detention unreasonable, a claim not raised in her complaint.  In

13   addition, she relies on cases that examine when detentions ripen into arrests because of police

14   tactics.  *See, e.g.,* ECF No. 57 at 7; *Washington v. Lambert*, 98 F.3d 1181 (9th Cir. 1996).

15           The court declines to address the reasonableness of the detention, apart from the

16   use of force, because the Third Amended Complaint does not include such a claim.  As the parties

17   confirmed at hearing, the focus of this motion is whether the handcuffing, a portion of the

18   excessive force claim, was reasonable.  As defendants have not challenged the excessive force

19   claim generally, it goes forward.  As explained below, there are disputed issues of fact on the

20   question of whether the handcuffing was excessive under the circumstances.

21           1. Standard

22           Although "the right to make an arrest or investigatory stop necessarily carries with

23   it the right to use some degree of physical coercion," the use of force unreasonable under the

24   totality of the circumstances violates the Fourth Amendment.  *Graham v. Connor*, 490 U.S. 386,

25   396 (1989).  The Ninth Circuit directs courts to undertake a three step inquiry in applying

26   *Graham*:

27           First, we assess the gravity of the particular intrusion on Fourth
             Amendment interests by evaluating the type and amount of force
28           inflicted.   Second we assess the importance of the government

1
2
3
4

> interests at stake by evaluating:   (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers and others, and (3) whether the suspect was actively resisting or attempting to evade arrest by flight.  Third, we balance the gravity of the intrusion on the individual against the government's need for that intrusion to determine whether it was constitutionally reasonable.

5    *Miller v. Clark Cnty*, 340 F.3d 959, 964 (9th Cir. 2003).  The court must assess reasonableness

6    "from the perspective of a reasonable officer on the scene."  *Graham*, 490 U.S. at 396.

7    Nevertheless, the inquiry into the reasonableness of a use of force "is inherently fact specific" and

8    "'should only be taken from the jury in rare cases.'"  *Green v. City & Cnty. of San Francisco*,

9    751 F.3d 1039, 1049 (9th Cir. 2014) (quoting *Headwaters Forest Def. v. Cnty of Humboldt*,

10   240 F.3d 1185, 1205-06 (9th Cir. 2000), *cert. granted, judgment vacated on other grounds*,

11   534 U.S. 801 (2001)).

12           2. Analysis

13           The parties discuss the entire episode, from Barry's first contact with Boarman

14   through Konstantindis's use of the taser but as confirmed at hearing, the only issue here is the use

15   of handcuffs.  Regarding the first *Miller* factor, the Ninth Circuit has recognized that "'using

16   handcuffs or other restraints is unreasonable in many situations' involving investigatory or *Terry*[4]

17   stops."  *Green*, 751 F.3d at 1050 (quoting *Robinson v. Solano Cnty*, 278 F.3d 1007, 1015 (9th Cir.

18   2002)); *Alexander v. Cnty. of Los Angeles*, 64 F.3d 1315, 1320 (9th Cir. 1995) ("handcuffing

19   substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is

20   not part of a typical *Terry* stop," but finding it justified because the suspects were believed to

21   have committed an armed robbery) (citation, internal quotation omitted); *see also Meredith v.*

22   *Erath*, 342 F.3d 1057, 1062-63 (9th Cir. 2003) ("[C]ircumstances which would justify a detention

23   will not necessarily justify a detention by handcuffing.  More is required.").

24           Turning to *Miller*'s step two, the importance of the government interests,

25   defendants argue they were dispatched to a battery in progress, based on reports of the manager

26   fighting with a woman in front of the CVS, and that Barawed confirmed the crime was a robbery;

27   the severity of the crime justified the use of handcuffs.  Reply, ECF No. 59 at 3.  Defendants have

28
           [4] *Terry v. Ohio*, 392 U.S. 1 (1968).

1   presented the transcript of the dispatch, which says "customer is physically fighting with the

2   manager out i/f [in front] of the store . . . ." ECF No. 54-3 at 50.  They have also presented

3   evidence that Barawed concluded the crime had been a robbery, but it is not clear he passed this

4   information to Barry or that the characterization of the crime as a robbery was based on anything

5   beyond the fight between the suspect and the manager outside the store.  *See, e.g., People v.*

6   *Estes*, 147 Cal. App. 3d 23, 28 (1983) (stating that a use of force to prevent a store security guard

7   from reclaiming the stolen property was sufficient to support a robbery conviction).  The dispatch

8   and even Barawed's characterization of the incident could be based on a tussle over the stolen

9   merchandise or fisticuffs.

10       The second factor, whether plaintiff threatened the officers' safety, is "the most

11   important of the three *Graham* factors." *Miller*, 340 F.3d at 964.  However, "[a] simple statement

12   by an officer that he fears for his safety is not enough; there must be objective factors to justify

13   such a concern." *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010).  Although Barry said

14   he was concerned for his safety, plaintiff said she did not act aggressively or threaten him.

15   Nothing on the videos contradicts plaintiff's account:  even though Boarman is moving around

16   and attempting to show Barry her receipt, she makes no threatening gestures or aggressive

17   movements toward him.  Plaintiff does not react physically to the officers until Konstantinidis

18   attempts to handcuff her, a reaction which cannot be used to determine whether the initial

19   decision to handcuff her was reasonable or excessive.  Finally, plaintiff avers she was not

20   attempting to flee, an account also borne out by the videos.

21       There is disputed evidence on the third question, whether the officers needed to

22   handcuff plaintiff to detain her.  Defendants point to her general uncooperativeness, but the

23   videos show little more than her indignation at being wrongly accused of a crime and her interest

24   in vindication.  Barry avers she did not respond to his commands, while Boarman says she was

25   cooperative.  There is no evidence she verbally threatened the officers or that the officers had any

26   reason to believe she had a weapon.  *Cf. United States v. Bautista*, 684 F.2d 1286, 1297-98 (9th

27   Cir. 1982) (finding handcuffing of men suspected of armed robbery was reasonable).

28   /////

1     Because of these disputed issues, summary judgment on this claim is denied.

2        D.  False Arrest

3     Defendants argue they had probable cause to arrest plaintiff for violating Penal

4  Code section 148 because she resisted being placed in handcuffs as part of her detention and the

5  investigation of the crime at the CVS.  ECF No. 54-1 at 16.

6     "A claim for unlawful arrest is cognizable under § 1983 as a violation of the

7  Fourth Amendment."  *Dubner v. City & Cnty. of San Francisco*, 266 F.3d 959, 964 (9th Cir.

8  2001).  To succeed on this claim, plaintiff must demonstrate that the officers lacked probable

9  cause to arrest her.  *Norse v. City of Santa Cruz*, 629 F.3d 966, 978 (9th Cir. 2010).

10    "In California, an officer has probable cause for warrantless arrest if the facts

11  known to him would lead a person of ordinary care and prudence to believe and conscientiously

12  entertain an honest and strong suspicion that the person is guilty of a crime."  *Blankenhorn v. City*

13  *of Orange*, 485 F.3d 463, 471 (9th Cir. 2007) (internal citations & quotations marks omitted);

14  *Dubner*, 266 F.3d at 964 ("Probable cause exists when, under the totality of the circumstances

15  known to the arresting officers (or within the knowledge of the other officers at the scene), a

16  prudent person would believe the suspect had committed a crime.").

17    The elements of a violation of Penal Code § 148(a) are "(1) the defendant willfully

18  resisted, delayed, or obstructed a police officer; (2) when the officer was engaged in the

19  performance of his or her duties; and (3) the defendant knew or reasonably should have known

20  that the other person was a peace officer engaged in the performance of his or her duties."

21  *People v. Simmons*, 42 Cal. App. 4th 1100, 1108-09 (1996).  However, an officer is not engaged

22  in "duties" for purposes of this section if he or she was acting unlawfully.  *People v. Gonzalez*,

23  51 Cal. 3d 1179, 1217 (1990).  Accordingly, in California, "[a] conviction for resisting arrest

24  under § 148(a)(1) may be lawfully obtained only if the officers do not use excessive force *in the*

25  *course* of making that arrest."  *Smith v. City of Hemet*, 394 F.3d 689, 696 (9th Cir. 2005)

26  (emphasis in original); *In re Michael V.*, 10 Cal. 3d 676, 681 (1974) ("[I]t is no crime in this state

27  to nonviolently resist the unlawful actions of police officers."); *Garcia v. Sup. Ct.*, 177 Cal. App.

28  /////

15

1    4th 803, 819 (2009) (stating that before a person may be convicted of violating § 148(a), there

2    must be proof the officer was acting lawfully at the time the offense against him was committed).

3            In this case, the evidence is disputed on the question whether defendants used

4    excessive force in handcuffing plaintiff as part of the detention.  The videos show her reacting

5    physically, but not necessarily violently.  Barry does describe plaintiff pushing her body into his

6    as she tries to avoid the handcuffs, but the three are close together, so any movement to avoid

7    handcuffing might indeed cause bodily contact.  A reasonable jury might determine these acts

8    were not violent resistance to arrest; a jury might find there was no crime in plaintiff's resistance

9    to the officers' attempt to handcuff her and consequently no probable cause to arrest her.

10   Defendants are not entitled to summary judgment in this claim.

11          E.  Konstantinidis' Participation

12          Konstantinidis argues he is not liable for the detention because Barry had detained

13   plaintiff before he arrived and he is not liable for the arrest because Barry wrote the citation.  ECF

14   No. 54-1 at 15-17.   Plaintiff says Konstantinidis was an integral participant in both activities.

15          The doctrine of integral participation "extends liability to those actors who were

16   integral participants in the constitutional violation, even if they did not directly engage in the

17   unconstitutional conduct themselves."  *Hopkins v. Bonvicino*, 573 F.3d 752, 770 (9th Cir. 2009).

18   Application of the rule "does not require that each officer's actions themselves rise to the level of

19   a constitutional violation."  *Boyd v. Benton Cnty.*, 374 F.3d 773, 780 (9th Cir. 2004).  "Integral

20   participation requires some *fundamental involvement* in the conduct that allegedly caused the

21   violation."  *Monteilh v. Cnty. of Los Angeles*, 820 F. Supp. 2d 1081, 1089 (C.D. Cal. 2011)

22   (emphasis in original).

23          As noted above, plaintiff is challenging the use of handcuffs accompanying the

24   detention, not the detention by itself.  As the evidence shows it was Konstantinidis who made the

25   first attempt to handcuff plaintiff and Konstantinidis who was instrumental in subduing plaintiff,

26   he is not entitled to summary judgment on this claim.

27   /////

28   /////

F.  Qualified Immunity

Law enforcement officers are shielded from suit unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The qualified immunity test comprises two inquiries, but a court may consider only the second in accordance with fairness and efficiency and in light of the circumstances of a particular case.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  Under the first prong, the court considers whether the alleged facts, taken in the light most favorable to plaintiff, show that defendants' conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grds. in Pearson*, 555 U.S. at 223. In resolving this first inquiry, the court determines whether the alleged facts, taken in the light most favorable to the plaintiff, show that defendants were reasonable in their belief that their conduct did not violate the Constitution.  *Wilkins v. City of Oakland*, 350 F.3d 949, 955 (9th Cir. 2003) (citing *Saucier*).  In other words, even if defendants' actions did violate the Fourth Amendment, a "reasonable but mistaken belief that [their] conduct was lawful would result in the grant of qualified immunity."  *Id.*; *see also Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1076 (9th Cir. 2011) (noting an officer is entitled to qualified immunity for unlawful arrest if he had probable cause or if "it is *reasonably arguable* that there was probable cause for the arrest") (emphasis in original).  Qualified immunity thus "provides ample protection to all but the plainly incompetent or those who knowingly violate the law."  *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

As noted above, viewing the evidence including the videos in the light most favorable to plaintiff, there are disputed issues of fact on the question whether a reasonable officer could have believed the Fourth Amendment permitted him to handcuff a woman who was neither armed, physically aggressive nor attempting to flee.  There is evidence that officers were aware the suspect had been involved in a physical confrontation of some sort with the manager of the CVS, but little more than that:  the record is silent or inconclusive as to the violence involved in that encounter, if any.  In these circumstances, the record does not show a reasonable officer would have acted reasonably in seeking to handcuff a young woman whose failure to cooperate

1    with the investigation was her continued protest of her innocence and demand to be taken to the

2    manager and thereby exonerated.  There are also disputed issues whether the officers were acting

3    lawfully when plaintiff reacted to the handcuffing and the impact of the potential overreaction on

4    the probable cause to arrest for resisting arrest.

5            Under the second prong, the court determines whether the constitutional right was

6    "clearly established." *Saucier*, 533 U.S. at 201.  A right is clearly established when "it would be

7    clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. at

8    202.  The reasonableness of a defendant's conduct is judged "against the backdrop of the law at

9    the time of the conduct." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).  In determining

10   whether the law put a defendant on notice, a court does "not require a case directly on point, but

11   existing precedent must have placed the statutory or constitutional question beyond debate."

12   *Ashcroft v. alKidd*, ___ U.S.___, 131 S. Ct. 2074, 2083 (2011). The court must "survey the legal

13   landscape," including "all available decisional law" if there is no binding precedent. *Trevino v.*

14   *Gates*, 99 F.3d 911, 917 (9th Cir.1996) (quotation marks omitted).

15           In *Washington v. Lambert*, the Ninth Circuit said that "'handcuffing substantially

16   aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a

17   typical *Terry* stop.'"  98 F.3d 1181, 1189 (9th Cir. 1996) (quoting *Bautista*, 684 F.2d at 1289).  It

18   also said that "[d]espite the absence of a bright-line rule," the cases make clear that intrusive

19   detentions are justified only in special circumstances, such as when (1) the suspect is

20   uncooperative or by his actions raises a reasonable possibility of the danger of flight; (2) the

21   police have information the suspect is armed; (3) the stop closely follows a violent crime or

22   precedes a potentially violent crime.  *Id*.; *see also Davis v. City of Las Vegas*, 478 F.3d 1048,

23   1054 (9th Cir. 2007) (discussing *Graham*, noting "[t]his is hardly the first case in which we have

24   analyzed . . . claims of excessive force by police officers); *Arpin v. Santa Clara Valley Transp.*

25   *Agency*, 261 F.3d 912, 921 (9th Cir. 2001) (handcuffing suspect did not constitute excessive force

26   when suspect refused to provide her identification even after officers warned she would be

27   arrested if she did not cooperate and pulled away from officer who attempted to handcuff her).

28   There is evidence that officers were told of the suspect's fight with the CVS manager and

18

1    Barawed's conclusion that the reported shoplift had in fact been a robbery.  But there is no

2    evidence Barawed communicated his conclusions to Barry and Konstantinidis, and no evidence

3    the officers believed the suspect had been involved in anything but some undefined physical

4    confrontation with the store manager.  Accordingly, case law put officers on notice in 2011 that

5    handcuffing an unresisting suspect could constitute excessive force.  They are not entitled to

6    qualified immunity.

7         The law similarly put the officers on notice that a use of excessive force could

8    render an arrest for resisting that force unlawful.  In *People v. White*, the court said, "an arrest

9    made with excessive force is . . . unlawful" in considering whether a defendant's resistance to an

10   officer's excessive force could constitute a violation of Penal Code § 148.  101 Cal. App. 3d 161,

11   167 (1980); *see also Smith*, 394 F.3d at 696 (same).  Thus a reasonable officer would be on notice

12   that using excessive force in the events leading up to a person's resistance could mean the

13   resistance did not violate section 148, which would in turn vitiate probable cause to arrest for a

14   violation of section 148.  Defendants are not entitled to qualified immunity.

15        G.  City and County Liability

16        "[A] local government may not be sued under § 1983 for an injury inflicted solely

17   by its employees or agents.  Instead, it is when execution of a government's policy or custom . . .

18   inflicts the injury that the government as an entity is responsible under § 1983."  *Monell v. Dep't*

19   *of Soc. Servs.*, 436 U.S. 658, 694 (1978).  To establish municipal liability under *Monell*, a

20   plaintiff must prove "(1) that [the plaintiff] possessed a constitutional right of which [s]he was

21   deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate

22   indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force

23   behind the constitutional violation." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir.

24   2011), *cert. denied*, ___U.S. ___, 133 S.Ct. 1725 (2013) (internal quotation marks omitted).

25   "Official . . . policy includes the decisions of a government's lawmakers, the acts of its

26   policymaking officials, and practices so persistent and widespread as to practically have the force

27   of law." *Connick v. Thompson*, ___U.S. ___, 131 S. Ct. 1350, 1359 (2011) (citations omitted).

28   /////

1        A plaintiff may also establish municipal liability by establishing that the

2   constitutional violation was caused by a failure to train employees sufficiently.  *See Price v. Sery*,

3   513 F.3d 962, 973 (9th Cir. 2008).  That showing depends on the following three elements:

4   (1) "the existing training program" must be inadequate "in relation to the tasks the particular

5   officers must perform"; (2) the officials must have been deliberately indifferent "to the rights of

6   persons with whom the police come into contact"; and (3) the inadequacy of the training "must be

7   shown to have 'actually caused' the deprivation of the alleged constitutional right."  *Merritt v.*

8   *Cnty. of Los Angeles*, 875 F.2d 765, 770 (9th Cir. 1989) (internal citations and quotation marks

9   omitted).

10        Defendants have provided evidence that the City has no part in setting policy for

11  or training the sheriff's deputies who act as City police officers.  They have also provided

12  evidence that the County provided training to Barry and Konstantinidis and has established

13  policies regarding detentions, arrests, and the use of force.  In addition, Barry and Konstantinidis

14  have averred they are aware of no policies encouraging the arrest and/or use of force on people

15  who express anger or contempt to law enforcement officers.  Plaintiff has provided no evidence

16  on these claims, arguing she cannot respond to them until she has undertaken discovery.  As

17  noted above, she has not made a sufficient showing to justify modifying the scheduling order to

18  permit her to pursue the discovery she could and should have pursued months ago.  Defendants

19  are entitled to summary judgment on the claims against the City and County.

20      H.  Bane Act

21        Defendants argue plaintiff's Bane Act claim fails because plaintiff did not have the

22  right to avoid a lawful detention and/or they are immune under California Government Code

23  § 845.8.  ECF No. 54-1 at 24.  Plaintiff disputes defendants' characterization of the requirements

24  of a Bane Act claim but does not address the claimed immunity.  ECF No. 57 at 15.

25        California's Bane Act, Civil Code § 52. 1, provides that a person "whose exercise

26  or enjoyment" of constitutional rights has been interfered with "by threats, intimidation, or

27  coercion" may bring a civil action for damages and injunctive relief.  The essence of such a claim

28  is that "the defendant, by the specified improper means . . . tried to or did prevent the plaintiff

1    from doing something he or she had the right to do under the law or force the plaintiff to do

2    something he or she was not required to do." *Austin B. v. Escondido Union Sch. Dist.*, 149 Cal.

3    App. 4th 860, 883 (2007).  "[T]he elements of the excessive force claim under § 52.1 are the

4    same as under § 1983.'"  *Chaudhry v. City of Los Angeles*, 751 F. 3d 1096, 1105 (9th Cir. 2014)

5    (quoting *Cameron v. Craig*, 713 F.3d 1002, 1022 (9th Cir. 2013)).  Here, because plaintiff is

6    alleging excessive force rather than challenging the propriety of the detention itself, her Bane Act

7    claim survives.

8              California Government Code § 845.8 provides, in relevant part:  "Neither a public

9    entity nor a public employee is liable for: . . . (b) Any injury caused by: . . . (3) a person resisting

10   arrest."  The California Supreme Court has said the law was designed "to immunize public

11   entities and public employees from the entire spectrum of potential injuries caused by persons

12   actually or about to be deprived of their freedom who take physical measures of one kind or

13   another to avoid the constraint or escape from it."  *Kisbey v. State of Cal.*, 36 Cal. 3d 414, 419

14   (1984).  The state court has held the law applies to injuries caused by the fleeing person to

15   herself.  *Ladd v. Cnty. of San Mateo*, 12 Cal. 4th 913, 920-21 (1996).  Defendants have cited no

16   case suggesting the statute immunizes officers from injuries they inflict on the person resisting

17   arrest.   They are not entitled to immunity.

18              IT IS THEREFORE ORDERED that:

19              1. Plaintiff's motion to modify the scheduling order, ECF No. 52, is denied; and

20              2. Defendants' motion for summary judgment, ECF No. 54, is granted as to the

21   claims against the City of Rancho Cordova and the County of Sacramento, but is denied in all

22   other respects.

23   DATED:  October 21, 2014.

24

25                                        UNITED STATES DISTRICT JUDGE

26

27

28

                                                 21